**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| | ) | |
| **NOVLETTE YVONNE LEWIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 19-cv-02059 (APM)** |
| | ) | |
| **ANDREW SAUL,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____ )

**MEMORANDUM OPINION**

**I.    INTRODUCTION**

Plaintiff Novlette Lewis challenges the Social Security Administration's denial of her application for disability benefits.  Plaintiff contends that an Administrative Law Judge (1) erred in finding that her migraine headaches are not severe, and (2) failed to give sufficient weight to the opinions of her treating and examining medical sources.  This matter is before the court on Plaintiff's Motion for Judgment of Reversal and Defendant's Motion for Judgment of Affirmance. For the reasons stated below, the court grants Plaintiff's Motion and remands the case for further proceedings consistent with this Memorandum Opinion.

**II.    BACKGROUND**

**A.    Factual Background**

*1.    Plaintiff's Application for Disability Benefits*

Plaintiff Novlette Lewis suffers from numerous medical conditions, including migraine headaches, depression, post-traumatic stress disorder, diabetes, and insomnia.  Admin. Rec.

[hereinafter A.R.] at 67.[1]   She filed an initial application for disability benefits with the Social Security Administration ("SSA") on September 8, 2015.  *Id.*  In her application, Plaintiff claimed that she had been unable to work since June 26, 2013, due to a concussion she had suffered after a fall at work.  A.R. at 70, 85.  The SSA denied Plaintiff's application on June 6, 2016, on the basis that her condition was not severe enough to keep her from working.  A.R. at 76–77, 95.  Plaintiff filed for reconsideration on June 14, 2016, stating that her conditions had worsened and had caused her "greater limitations."  A.R. at 79, 83.  The SSA again denied her application on September 12, 2016, for the same reasons as the initial determination.  A.R. at 90–91.  Plaintiff filed a request for hearing on June 21, 2017.  A.R. at 95.  An Administrative Law Judge ("ALJ") dismissed her request on August 4, 2017, because it was untimely and Plaintiff did not have good cause for missing the deadline.  A.R. at 95–96.  Plaintiff then appealed to the SSA's Appeals Council, which vacated the order of dismissal and remanded the case for further proceedings.  A.R. at 98.

    2.    *The Hearing Before the ALJ*

    Plaintiff received an administrative hearing on July 30, 2018.  A.R. at 32.  Plaintiff submitted documentary evidence detailing the severity of her disability and presented her own testimony and that of a vocational expert, Teresa Kolpenski.  *See* A.R. at 32–65.  In her opening statement, Plaintiff's attorney explained that Plaintiff had suffered a concussion after a fall at her job and has experienced migraines since then.  A.R. at 38.  Her attorney stated that the migraines are the primary reason that Plaintiff is unable to work, and "the symptoms [ ] related to the migraines leave her in pain so often that she has difficulty concentrating."  *Id*.

    To start, the ALJ questioned Plaintiff about the treatments she had undergone for the migraines and noted that the medication she was currently taking was not for migraines.  A.R. at

---

[1] The Administrative Record can be found at ECF Nos. 4-1 through 4-25.

39.  The ALJ then inquired about Plaintiff's workman's compensation, *id.*, explored Plaintiff's work history, A.R. at 40–42, and asked Plaintiff if, "other than the migraines," there was anything else that "prevent[ed] plaintiff from working," A.R. at 43.  Plaintiff replied that she had been diagnosed with mood disorders, which make it difficult for her to concentrate.  A.R. at 44.  Plaintiff also detailed how the migraines affect her memory, stating that on the days she has migraines, she is unable to recall anything from those days.  *Id.*  She further stated that due to the memory loss caused by her migraines, she is unable to do her former job as a social worker because it requires her to remember information from each day.  A.R. at 44–45.

Plaintiff's attorney began questioning Plaintiff by asking about her allergies to medications.  A.R. at 46.  When the ALJ interrupted Plaintiff's response and asked about the relevance of the question, Plaintiff's attorney explained that Plaintiff is allergic to a lot of medications, including migraine medication, and the ALJ had been "questioning [Plaintiff on] why she's not taking them."  A.R. at 47.  The ALJ then stated, "[g]o ahead, I don't need any testimony, thank you.  The testimony needs to be concerning her functional limitations, concerning her severe impairment."  *Id.*  Plaintiff's attorney responded, "if I'd been allowed to continue this line of questioning, we would have ended up talking about her having an ER visit after taking medication."  *Id.*  As the ALJ requested, Plaintiff's attorney ended this line of questioning, but continued to question her on other topics.

The ALJ then interjected, asking Plaintiff what happened when she returned to work, and Plaintiff stated that because she was experiencing concentration and memory issues, she was unable to function properly on the job and was sent home.  A.R. at 48.  When her attorney resumed questioning, Plaintiff then explained that since the doctor prescribed her light-duty work, she was sent home on workman's compensation because her employer did not have a light-duty position

available.  A.R. at 50.  As she attempted to explain this, the ALJ once again interrupted Plaintiff, and expressed doubt that Plaintiff's workman's compensation injury continued to exist.  *Id.*

Plaintiff's attorney resumed questioning Plaintiff.  When asked about her mobility, Plaintiff explained that she cannot sit or stand still for long periods of time.  A.R. at 51.  Plaintiff described her knee impairments, as well as her anxiety attacks. A.R. at 51–52.  Plaintiff also testified about her migraine headaches.  A.R. at 53.  Plaintiff explained that the migraines can last three or more days; she is unable to function during them; and she is unable to remember anything that happens during a migraine.  *Id*.  She further stated that when she has a migraine, which happens almost daily, she has to stay in bed.  *Id.*

Finally, the ALJ questioned the vocational expert, Teresa Kolpenski on various hypotheticals.  A.R. at 53–58.  Kolpenski explained that a person with Plaintiff's qualities and limitations would no longer be able to do the work she had previously performed as a social worker.  A.R. at 56.  Instead, Kolpenski stated, that person would be able to perform the following positions: cashier, housekeeper, document preparer, and a kitchen helper. A.R. at 56–57.  She added that, if that person were to be off task 10 percent of the workday, she still would be able to perform these jobs, A.R. at 57.  If that person were to be off task 20 percent of the workday, however, Kolpenski said she would not be able to perform any jobs in the national economy.  A.R. at 57–58.  When Plaintiff's attorney questioned Kolpenski, she again stated that a person who would only be able to maintain concentration and attention for less than an hour would not be competitively employable in the national economy, A.R. at 58, and that someone who would be absent on average four times a month would not be able to maintain employment, A.R. at 59. Finally, Kolpenski testified that someone unable to work a complete eight-hour shift would not be

able to work full time in the national economy.  A.R. at 60.  After further discussion of specific job opportunities and a short closing statement, the hearing concluded.

        3.     *Physicians' Reports*

In addition to live testimony, the ALJ received into evidence the opinions and reports of several different physicians, who spoke to Plaintiff's various impairments.  Two of the reports were from state agency physical health consultants, Drs. Walter Y.K. Goo and Eduardo Haim. Both physicians opined that Plaintiff retained the ability to perform a full range of medium work. A.R. at 72–73, 86–87.  Neither physician had the opportunity to conduct an independent, in-person examination of Plaintiff or to review the entire medical record before forming his opinion.  A.R. at 19–20.  State agency mental health consultants, Patricia Cott and Nancy Heiser, both PhDs, evaluated Plaintiff's mental health conditions.  A.R. at 73–75, 87–88.  Both were of the opinion that Plaintiff retained the ability to carry out short, simple tasks on a regular basis.  *Id*.  Neither physician examined Plaintiff before forming her opinion.  A.R. at 23.

Plaintiff entered into the record reports from her consulting and treating physicians. Plaintiff offered the report of a consulting neurologist, Dr. Richard M. Restak, who in June 2014, had opined that Plaintiff would be unable to return to work until her headaches were better controlled.  A.R. at 1918–20.  Dr. Restak examined Plaintiff in person in June 2014 but did not review her entire medical record before forming his opinion.  *Id*.; *see also* A.R. at 20 (observing that Dr. Restak did not "review and consider the entire medical record before forming his opinion").

Plaintiff also submitted a treating-source statement from her psychiatrist, Dr. Frederick Wu, dated June 6, 2018.  Dr. Wu diagnosed Plaintiff with "major depression disorder recurrent episode," "anxiety disorder," and "p[er]sistent depressive disorder."  A.R. at 2345–49.  He also

expressed the view that Plaintiff can only maintain attention and concentration between 15 and 30 minutes before needing redirection or requiring a break, and that she would be off task 10 to 15 percent of the day and absent four or more times per month.  A.R. at 2348–49.  Dr. Wu had examined Plaintiff multiple times over the span of approximately three years.  *See, e.g.*, A.R. at 2355–71; 2373–76.  His most recent examination appears to have taken place on May 24, 2018.  A.R. at 2345.

Plaintiff entered into evidence a second treating-source statement from Dr. William J. Narracci, her primary care doctor.  Dr. Narracci explained that due to, among other things, Plaintiff's symptoms of dizziness, migraines, depression, and back pain, A.R. at 2351, she is limited in how much she can lift and carry, and she is not able to sit for more than six hours and not able to stand or walk for more than an hour out of a typical eight-hour workday, A.R. at 2352.  He also opined that she likely would be off task at least 25 percent of the day and absent four or more times monthly.  A.R. at 2351.  He further stated that Plaintiff can maintain attention and concentration for less than one hour before "requiring a break due to symptoms such as pain or medication side effects."  *Id.*  As of June 2018, Dr. Narracci had been treating Plaintiff for five months.  *Id.*

### 4.     *The ALJ's Ruling*

"The SSA uses a sequential five-step process to evaluate a disability claim, and the ALJ engages in that same process anew upon review."  *Jackson v. Colvin*, No. 16-cv-0010, 2017 WL 1534327, at *1 (D.D.C. April 27, 2017) (citing 20 C.F.R. § 404.1520(a)(4)).  First, the individual must show that she is not presently engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i). Second, she must establish that she has a "severe impairment" that "significantly limits [her] physical or mental ability to do basic work activities."  *Id.*

§§ 404.1520(a)(4)(ii), 404.1520(c).    Third, the claimant must show that she suffers from an impairment that meets or equals an impairment listed in the appendix to the SSA regulations.  *Id.* § 404.1520(a)(4)(iii).  If she makes such a showing, she is deemed disabled within the meaning of the Act, and the inquiry concludes.  *Id.*  If not, the ALJ moves on to the fourth step and considers the claimant's residual functional capacity[2] and past relevant work.  *Id.* § 404.1520(a)(4)(iv).  If the claimant is still able to do her past relevant work, she is not disabled.  *Id.*  At the fifth and final step, the ALJ considers the claimant's residual functional capacity and age, education, and work experience to determine if she can make an adjustment to other work.  *Id.* § 404.1520(a)(4)(v). If the claimant cannot adjust to other work, the ALJ will find that she is disabled.  *Id.*  "The applicant bears the burden of proof as to the first four factors," but if she meets those criteria, then the burden shifts to the SSA, and it must establish the fifth factor by "demonstrating that there are jobs in the national economy that the applicant can perform."  *Jackson*, 2017 WL 1534327, at *1.

Here, the ALJ adhered to the five-step process in her written decision.  *See* A.R. at 16–26. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since June 26, 2013.  A.R. at 18.

At step two, the ALJ determined that Plaintiff's mood and affective disorders were severe but that her migraines were not.  *Id*. (finding that "there is no evidence that [migraine headaches] more than minimally limit [Plaintiff's] ability to engage in basic work activities").  The ALJ offered several reasons for deciding that Plaintiff's headaches constituted a non-severe impairment.  First, the ALJ reasoned that in June and July of 2013, Plaintiff underwent a CT-scan and MRI of her head and brain, and both tests returned normal with no sign of acute intracranial

---

[2] Residual functional capacity measures the most a person can still do despite her limitations. 20 C.F.R. § 416.945.

process.  *Id*.  (citing A.R. at 2441; A.R. at 1831).  Second, the examination notes, the ALJ explained, did not support Plaintiff's statements of frequency or severity of her headaches.  *Id*. The ALJ observed that Plaintiff "generally presents to medical examinations in no acute or apparent distress," and there was no evidence of recent emergency hospital visits to treat her migraines.  *Id*.  Third, the ALJ reasoned that the migraines could not have been as bad as Plaintiff complained of, because Plaintiff had not been fully compliant with her treatment options.  *Id*. While Plaintiff reported improvement on acupuncture, she had not tried it recently due to a fear of needles, *id*., and although the drug Topamax alleviates the severity of Plaintiff's headaches, she stopped taking it because she was worried about kidney stones, A.R. at 19.  Additionally, Plaintiff had declined oral steroids and Toradol injections.  *Id*. (citing A.R. at 2021, 2065).  Finally, the ALJ noted that although Plaintiff reported frequent falls, "she maintains an intact, normal gait with normal coordination," and that a videonystagmography "returned grossly normal."  *Id*.  (citing A.R. at 1833).  The ALJ also addressed Plaintiff's back and knee issues, and her type II diabetes, finding that neither constituted a severe impairment.  *Id.*

The ALJ went on to explain how she considered and weighed the medical opinions in the record.  She stated that she gave little weight to state agency physicians Drs. Goo and Haim—both of whom opined that Plaintiff "retains the ability to perform a full range of medium work"— because "the examination notes and imaging studies throughout the record [did] not indicate that [Plaintiff] experience[d] any limitations as a result of her medically determinable physical impairments."  *Id*.  Moreover, the ALJ reasoned, neither physician conducted an in-person exam on Plaintiff, nor did they review the entire medical record before forming their opinions.  A.R. at 19–20.

Next, she addressed Dr. Restak's opinion, Plaintiff's consulting neurologist, who had opined that Plaintiff would be unable to return to work until her headaches were better controlled. A.R. at 20.  The ALJ gave little weight to this opinion, because Dr. Restak's "detailed examination notes" did not support this conclusion, his examination of Plaintiff's cranial nerves did not reveal any abnormal findings, *id*. (citing A.R. at 1919), and the imaging studies in the record did not support his opinion, *id*.  Finally, the ALJ observed that Dr. Restak did not review Plaintiff's entire medical record before forming his opinion.  *Id.*

Lastly, the ALJ considered Dr. Narracci's June 2018 treating-source statement. Dr. Narracci had determined that Plaintiff "is limited to the lifting and carrying requirements of sedentary work where she would be unable to sit, stand, or walk for a combined total of eight hours in an eight-hour work day." *Id*. (citing A.R. at 2352).   The ALJ gave little weight to Dr. Narracci's opinion because the imaging studies in the record did not support it; his opinion was "inconsistent with the exam findings throughout the record"; and Dr. Narracci had only treated Plaintiff for five months at the time that he formed his opinion.  *Id.*

Moving to step three, the ALJ determined that Plaintiff did not "have an impairment or combination of impairments that me[t] or medically equal[ed] the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526)." *Id.*  She specifically considered listings 12.04, which addresses depressive disorders, and 12.06, which pertains to anxiety.  *Id.*; *see also* Disability Evaluation under Social Security, 12.00 Mental Disorders - Adult.[3]  Because the ALJ had determined Plaintiff's migraines were not severe, she did not consider any listing for that impairment.

---

[3] Available at: https://www.ssa.gov/disability/professionals/bluebook/12.00-MentalDisorders-Adult htm#12_04.

At step four, the ALJ determined that Plaintiff had the residual functional capacity "to perform a full range of work at all exertional levels with non-exertional limitations." A.R. at 21. This meant she could "work limited to simple, routine tasks" and was "able to remain on task at least ninety percent of an eight-hour workday." *Id*. The ALJ found that Plaintiff's "mental status examinations did not reveal any abnormal findings, aside from a depressed, anxious mood with a restricted, congruent affect," *id*., and noted that Plaintiff's mental health treating providers described her abilities and capacity as normal, *id*. The ALJ also noted gaps in Plaintiff's mental health treatment. A.R. at 22. For example, her examinations with Dr. Wu were sporadic. A.R. at 23. Plaintiff was never hospitalized for psychiatric treatment. *Id*. Such rare, conservative treatment, said the ALJ, indicates that Plaintiff's mental impairments were not as severe as claimed. *Id*. Lastly, the ALJ reasoned that Plaintiff's daily activities did not support the asserted severity of her mental impairments, and that although Plaintiff complains of panic attacks, she retains the ability to drive, grocery shop, prepare meals, and travel. *Id*.

In reaching her step-four conclusion, the ALJ afforded great weight to the opinions of state agency mental health consultants Drs. Cott and Heiser. *Id*. Both opined that Plaintiff "retains the ability to carry out short, simple tasks on a regular basis." *Id*. (citing A.R. at 74, 88). She afforded them this weight because "the mental status examination findings throughout the record support" their opinions, and although neither examined the claimant, "a detailed explanation supports" both of their opinions. *Id*. Finally, she added that because both of them are state agency mental health consultants, they are therefore experts on the SSA's rules and regulations. *Id*. On the other hand, the ALJ gave little weight to Dr. Wu's June 2018 opinion that Plaintiff can only remain on task for 85 to 90 percent of a typical workday, can only pay attention in 30-minute intervals before needing a break, and would miss four days of work each month, *id*.; *see also* A.R. at 2345–49,

because it was inconsistent with Dr. Wu's treatment notes, which did not reveal any abnormal findings aside from a "depressed, anxious mood and congruent affect," A.R. at 23.  She added that Dr. Wu only treated Plaintiff on an intermittent basis and that he himself stated his "ability to comment [was] somewhat limited by infrequent contact."  A.R. at 23 (quoting A.R. at 2345).  Finally, she observed that Dr. Wu had not reviewed the entire medical record before forming his opinion. A.R. at 24.  The ALJ also gave little weight to Dr. Narracci's opinion that Plaintiff would be off task for more than 25 percent of the day and that she is unable to concentrate for even one hour because it was "outside of [Dr. Narracci's] area of expertise" and not supported by the overall record.  *Id.*; *see also* A.R. at 2351–54.

Lastly, she considered the third-party statements submitted by Plaintiff's daughters.  A.R. at 24.  One daughter opined that Plaintiff experienced memory loss, and that she becomes easily overwhelmed. *Id*. The other said that Plaintiff has "episodes of depression, characterized by forgetfulness and exhaustion, as a result of her headaches." *Id*.  The ALJ afforded these opinions little weight because the record did not reflect that either daughter had any formal medical training, and as Plaintiff's daughters, their statements "cannot be viewed as coming from entirely objective, disinterested third parties." *Id*.  Their statements also suggested a more restrictive functional capacity than found and were "not supported by or consistent with the record as a whole." *Id*. Considering all of the aforementioned opinions and evidence, the ALJ determined that, although Plaintiff is unable to perform any past relevant work, A.R. at 24, she possesses a residual functional capacity that enables her "to perform a full range of work at all exertional levels with non-exertional limitations," A.R. at 21.

At step five, the ALJ determined that, considering Plaintiff's "age, education, work experience, and residual functional capacity, there are jobs that exist in the national economy that

Plaintiff can perform."  A.R. at 25.  Citing the vocational expert's testimony, the ALJ found that Plaintiff can perform the following jobs:  housekeeping cleaner, document preparer, kitchen helper, and cashier.  *Id.*  Accordingly, the ALJ determined that Plaintiff was not disabled, as defined by the Social Security Act.  A.R. at 26.

In December 2018, Plaintiff submitted a Request for Review with the SSA Appeals Council, which was denied in May 2019.  The Council "found no reason under [SSA] rules to review the [ALJ's] decision," meaning that the ALJ's decision "is the final decision of the Commissioner of Social Security in your case."  *See* A.R. at 1–6.

### B.  Procedural Background

Plaintiff filed this action on July 11, 2019.  *See* Compl., ECF No. 1.  On August 27, 2019, Defendant filed an Answer and the full administrative record.  *See* Answer, ECF No. 3; Administrative Record, ECF No. 4.  Thereafter, Plaintiff filed a Motion for Judgment of Reversal on November 1, 2019.  Mot. for Judgment of Reversal, ECF No. 8, Mem. in Supp. of Pl.'s Mot., ECF No. 8-1 [hereinafter Pl.'s Mot.].  Defendant filed a Motion for Judgment of Affirmance and Opposition to Plaintiff's Motion for Judgment of Reversal on December 17, 2019.  Mot. for Judgment of Affirmance & Opp'n to Pl.'s Mot., ECF No. 9 [hereinafter Def.'s Mot.].  Briefing concluded on January 2, 2020, *see* Pl.'s Reply Brief, ECF No. 11, and the parties' motions are now ripe for consideration.

### III.  STANDARD OF REVIEW

"In a Social Security disability case, a reviewing court must uphold an ALJ's determination if it correctly applies the governing legal standards and is based on substantial evidence in the record."  *Warfield v. Colvin*, 134 F. Supp. 3d 11, 16 (D.D.C. 2015) (citing 42 U.S.C. §§ 405(g), 1383(c)(3)).  The bar for substantial evidentiary sufficiency "is not high."  *Biestek v. Berryhill*,

139 S. Ct. 1148, 1154 (2019).  It means "more than a mere scintilla," or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citations omitted). The reviewing court must not substitute its own judgment for that of the ALJ or conduct independent fact-finding. *Warfield*, 134 F. Supp. 3d at 16 (citing *Martin v. Apfel,* 118 F. Supp. 2d 9, 13 (D.D.C. 2000)).  This is a deferential standard, but it is not toothless; a court's "task on appeal is to carefully scrutinize the record to determine whether the ALJ's decision is supported by substantial evidence and to ensure that the ALJ has adequately articulated the basis for the decision." *Id.* (citing *Simms v. Sullivan*, 877 F.2d 1047, 1050 (D.C. Cir. 1989)).  "The ALJ's opinion must show that he 'has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits,' including evidence that was rejected.'" *Id.* at 14 (citing *Simms*, 877 F.2d at 1050; *Brown v. Bowen*, 794 F.2d 703, 708 (D.C. Cir. 1986).

## IV.    DISCUSSION

Plaintiff raises two challenges to the ALJ's no-disability determination.  First, she argues that "[t]he ALJ's finding that Plaintiff's headaches result in no work-related limitations is contrary to law and not supported by substantial evidence."  Pl.'s Mot. at 1.  Second, she contends that "[t]he ALJ erred by failing to weigh the opinions of treating and examining medical sources in accordance with Agency policy and D.C. Circuit precedent."  *Id.*  The court considers these contentions in turn.

### A.    Sufficiency of the Evidence

The ALJ made multiple errors in finding that Plaintiff's migraines were not sufficiently "severe" at step two of the sequential evaluation process.  Because of these errors, the ALJ's determination that Plaintiff's headaches result in no work-related limitations was unsupported by substantial evidence.

*First*, the ALJ wrongly concluded that the absence of objective evidence in imaging scans is inconsistent with a diagnosis of migraine headaches.  *See* A.R. at 18–19 (citing a 2013 CT-scan of Plaintiff's head that "showed no evidence of an acute intracranial process," an MRI of her brain one month later that "returned normal," and a "videonystagmography, which returned grossly normal").  That conclusion cannot be correct when the SSA has long recognized that there are no objective medical tests for evaluating the presence of headaches.  In 2009, for instance, the SSA issued "SSA Questions & Answers 09-036," a guidance document "regarding the evaluation of migraine headaches."  *See* SSA Questions and Answers 09-036 (Dec. 15, 2009)[4] [hereinafter SSA Q&A 09-036]; *see also* Pl.'s Mot. at 17, 31.  That guidance states that, "[a]ccording to the medical literature, there are no laboratory findings or clinical signs to substantiate the presence of migraine headaches in most cases."  SSA Q&A 09-036 at 1.  The ALJ, however, made no mention of SSA Q&A 09-036, and Defendant on appeal does not dispute its applicability at the time of the ALJ's adjudication, so the court may rely on it.  *See generally* Def.'s Mot. (making no mention of SSA Q&A 09-036, which Plaintiff had cited); *see also McCampbell v. Comm'r of Soc. Sec.*, No. 3:16CV330-CWR-MTP, 2017 WL 3881463, at *5 (S.D. Miss. Aug. 7, 2017) ("The Commissioner does not contend or argue that Q&A 09-036 was inactive or inapplicable at the time the ALJ made his determination, thus, the Court may utilize it in addressing the current appeal."), *report and recommendation adopted*, No. 3:16-CV-330-CWR-MTP, 2017 WL 3881072 (S.D. Miss. Sept. 1, 2017).

Recent agency guidance is to the same effect.  In August 2019, after the hearing in this case, the agency issued a Notice of Social Security Ruling that continued to acknowledge that normal imaging results are not inconsistent with a diagnosis of migraine headaches.  *See* Social

---

[4] Available at https://www.paletta.org/wp-content/uploads/2018/02/SSA-QA_09-036.pdf.

Security Ruling, SSR 19-4p; Titles II and  XVI: Evaluating Cases Involving Primary Headache Disorders, 84 Fed. Reg. 44,667 (Aug. 26, 2019).  The Ruling explains that "physicians diagnose a primary headache disorder only after excluding alternative medical and psychiatric causes of a person's symptoms." *Id.* at 44,669.  The Ruling continues:

> To rule out other medical conditions that may result in the same or similar symptoms, a physician may also conduct laboratory tests or imaging scans.  For example, physicians may use magnetic resonance imagining (MRI) to rule out other possible causes of headaches—such as a tumor—meaning that an unremarkable MRI is consistent with a primary headache disorder diagnosis.

*Id.* (footnote omitted).  The Ruling accordingly states:  "While imaging may be useful in ruling out other possible causes of headache symptoms, *it is not required for a primary headache disorder diagnosis*." *Id.* (emphasis added).  Courts likewise have recognized that "there are no objective medical tests for evaluating headaches." *Riddle v. Saul*, Civil Action No. 19-cv-00748-NRN, 2019 WL 6606711, at * 2 (D. Colo. Dec. 5, 2019); *see also Malik v. Colvin*, Civil Action No. 12-cv-02932-WYD, 2014 WL 1257070, at *5 (D. Colo. Mar. 27, 2014) ("Many federal district courts recognize that there are no objective medical tests for evaluating migraines/headaches, and hold that there is no requirement that an impairment such as migraines be proven through objective medical findings." (collecting cases)).  The ALJ's heavy reliance on unremarkable imaging results to dismiss the severity of Plaintiff's migraines therefore was error.

*Second*, the ALJ improperly discounted the diagnosis of migraines on the ground that "[t]he examination notes do not support the frequency or severity of her headaches."  A.R. at 18.  According to SSA Q&A 09-036, clinically accepted indicators of migraines include (1) headache events lasting from four to 72 hours if untreated or unsuccessfully treated; (2) two of the following: (a) unilateral, pulsating quality, (b) moderate or severe pain intensity, or (c) worsened by routine physical activity; and (3) at least one of the following during the headache: (a) nausea,

15

(b) vomiting, (c) photophobia, or (d) phonophobia.  SSA Q&A 09-036.  Plaintiff's medical records reflect these clinical indicators.  For instance, a record from July 16, 2013, notes that, since returning to work, Plaintiff "had a continuous holocephalic and throbbing headache with nausea, photo and phonophobia."  A.R. at 579.  Treatment notes from October 9, 2013, show Plaintiff's headaches ranged from 6 to 10 in pain, were aggravated by sound, and accompanied by nausea, dizziness, and sensitivity to light.  A.R. at 366; *see also* A.R. at 1841 (treatment notes reporting similar symptoms on October 17, 2013).  The same is true of treatment notes from November and December 2013.  A.R. at 339, 346, 357, 1841.  Plaintiff's symptoms continued into 2014.  Notes from February 6, 2014, show headaches occurring two to three times per week, lasting from six hours to 24 hours at severe pain levels, with nausea and vomiting returning.  A.R. at 1841. In March 2014, Plaintiff reported being unable to "get the headaches and depression and other symptoms in control."  A.R. at 381.  In August 2014, she continued to report nausea and intermittent dizziness with her headaches.  A.R. at 1840.  Migraines symptoms continued in December 2014.  A.R. at 1839.  By the spring and summer of 2015, despite treatment efforts, her headaches had worsened.  A.R. at 451, 1838.  These are but a snapshot of Plaintiff's medical records, which would appear to support the severity of migraine symptoms.  The ALJ's decision offers no explanation for why she disregarded or discounted this evidence.

*Third*, the ALJ incorrectly faulted Plaintiff for not being "entirely compliant in obtaining the recommended treatment for her migraine headaches" without making sufficient inquiry as to the reasons for the purported non-compliance.  A.R. at 18.  For starters, SSA Q&A 09-036 states that "[w]e do not consider treatment non-compliance . . . because . . . there is no [ ] standard of care in the treatment of migraine headaches."  SSA Q&A 09-036 at 3.  The ALJ's decision does not acknowledge this migraine-specific guidance.  In addition, even if Plaintiff's non-compliance

were a relevant consideration, "[t]o use non-compliance with prescribed treatment plans in this way requires an *extensive inquiry* by the ALJ into the circumstances surrounding a claimant's non-compliance." *Jackson v. Barnhart*, 271 F. Supp. 2d 30, 38 (D.D.C. 2002) (citing 20 C.F.R. § 404.1530) (emphasis added).  Here, however, the ALJ pretermitted any such "extensive inquiry," when she foreclosed Plaintiff's counsel's efforts to ask Plaintiff why she had not followed certain treatments.  A.R. at 47 (ALJ cutting off testimony concerning allergies to medication and stating that "[t]he testimony needs to be concerning her functional limitations, concerning her severe impairment").  As counsel explained, had she been permitted to continue her examination, she would have elicited testimony about Plaintiff's allergic reactions to pain relievers and a trip to the emergency room "after taking medication."  *Id.*  Insofar as Plaintiff's purported non-compliance was relevant at all, foreclosing such inquiry was erroneous.

*Fourth*, the ALJ improperly discounted the opinion of Plaintiff's consulting neurologist, Dr. Restak, who in June 2014 found that Plaintiff "will not be able to return to work until these headaches are brought under better control," although he also opined that medication likely would aid Plaintiff in controlling her symptoms.  A.R. at 1920.  In this Circuit, a treating physician's opinion is typically "binding" on the ALJ "unless contradicted by substantial evidence." *Williams v. Shalala*, 997 F.2d 1494, 1498 (D.C. Cir. 1993).  The ALJ must "give good reasons" for rejecting such an opinion.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Jones v. Astrue*, 647 F.3d 350, 355–57 (D.C. Cir. 2011) (remanding case to the ALJ to explain reasons for rejecting the treating physician's opinion).  The ALJ gave Dr. Restak's opinion "little weight," A.R. at 20, but her reasons for doing so were not "good reasons."  First, she explained that Dr. Restak's "detailed examination notes" do not support his opinion, citing only his examination of "the claimant's cranial nerves [which] do not reveal any abnormal findings."  *Id.*  She added that the CT-scan and

17

MRI of claimant's brain did not support Dr. Restak's opinion. *Id.* But, as already discussed, the SSA recognizes that no particular laboratory signs or imaging results are necessary to diagnose migraine headaches. Thus, there was no inconsistency between Dr. Restak's opinion and the negative imaging results. Next, she faulted Dr. Restak for not considering the "entire medical record before forming his opinion" and noted that, at the time he formed his opinion, "claimant's treatment was not specific to the type of headaches she suffers from." *Id.* But this logic misconstrues Dr. Restak's role. He saw Plaintiff for a one-time "independent neurologic evaluation," *id.* at 1918; nothing in the record suggests that such an evaluation required him to review the "entire medical record" to reach his opinion. It also is unclear what the ALJ meant when she said that Plaintiff's "treatment was not specific to the types of headaches" from which Plaintiff suffered at the time of Dr. Restak's evaluation. Dr. Restak identified Plaintiff's "most pressing problem" as a "headache of a vascular type in the general category of a migraine-vascular headache." A.R. at 1920. This is precisely the type of headache about which Plaintiff had complained since her fall in June 2013.

*Fifth*, and finally, in addition to the foregoing stage-two errors, the ALJ made another critical error at the fourth stage—she failed to account for Plaintiff's migraines in making her residual functional capacity assessment. *See* A.R. 21–24. SSA regulations require the ALJ to consider the effects of all impairments at step four, including those that are considered not severe: We "will consider all of [an applicant's] medically determinable impairments of which we are aware, including . . . medically determinable impairments that are not 'severe,' . . . when we assess . . . residual functional capacity." 20 C.F.R. § 416.945(a)(2). Here, however, when the ALJ determined Plaintiff's residual functional capacity at step four, nowhere did she discuss Plaintiff's

migraines or how they affected her ability to work.  A.R. at 22–24.  This error compounded the shortcomings of her severity analysis at step two.

The court rejects Defendant's suggestion that any error at step two is harmless.  Def.'s Mot. at 16–17.  A step-two, severity-assessment error is deemed harmless and does not require reversal "so long as the ALJ considered the omitted impairment(s) in evaluating the remaining steps in the sequential analysis." *Hicks v. Astrue*, 718 F. Supp. 2d 1, 12 (D.D.C. 2010).  Here, the non-severity assessment at step two not only resulted in non-consideration of migraines as a possible listed impairment at step three, but critically the ALJ also did not consider at all the effects of migraines on Plaintiff's residual functional capacity at step four.  *See* A.R. at 21–24.  The step-two error in this case therefore cannot be deemed harmless because the ALJ did not consider migraines "in evaluating the remaining steps in the sequential analysis." *Hicks*, 718 F. Supp. 2d at 12.  The other case that Defendant cites, *Blackmon v. Astrue*, is not to the contrary.  There, the court found that "the ALJ properly assessed Plaintiff's [residual functional capacity] and considered all of [his] impairments—including [the non-severe impairments]—at steps four and five of the analysis." *Blackmon*, 719 F. Supp. 2d 80, 91–92 (D.D.C. 2010).  Here, as discussed, the ALJ's errors at step two resulted in her not considering Plaintiff's migraines at step three, and the ALJ compounded those errors by not considering the effects of that impairment at step four.  The ALJ's step-two error therefore was not harmless.

### B.   Treating Physicians

The court already has found that the ALJ erred in giving "little weight" to Dr. Restak's opinion as a consulting physician.  Plaintiff advances that same error with respect to two treatment providers, Dr. Frederick Wu, a psychiatrist, and Dr. William Narracci, a primary care doctor of osteopathy.  Pl.'s Mot. at 20–33.  Both submitted treating source statements.  In June 2018,

Dr. Narracci opined that, because of her impairments, Plaintiff likely would be off task at least 25 percent of the day and absent four times or more monthly, and she can maintain concentration and attention for less than one hour before requiring a break.  A.R. at 2351.  Dr. Narracci also opined that Plaintiff could lift and carry 20 pounds rarely, ten pounds occasionally, and less than ten pounds frequently, and could sit for six hours in an eight-hour day but only stand/walk for one hour and must be permitted to sit and stand at will.  A.R. at 2351–52.  Dr. Wu opined that Plaintiff could only maintain concentration between 15 and 30 minutes before needing redirection or requiring a break, and that she likely would be off task 10 to 15 percent of the day and absent four or more times per month.  A.R. at 2348–49.  He also opined that she was mildly to moderately limited in her ability to concentrate, persist, or maintain pace, and mildly limited in ability to interact with others, understand and apply information, and carry out instructions.  A.R. at 2347–48.  The ALJ gave both of these opinions "little weight."  A.R. at 23–24.

The D.C. Circuit has adopted what is known as the "physician rule," which states that a "treating physician's report is 'binding on the fact-finder unless contradicted by substantial evidence.'"  *Workman v. Colvin*, 204 F. Supp. 3d 1, 5 (D.D.C. 2016) (quoting *Butler v. Barnhart*, 353 F.3d 992, 1003 (D.C. Cir. 2004)); *see also Williams*, 997 F.2d at 1498.  An ALJ may reject or discount a treating physician's opinion if such opinion is (1) not "well supported by medically acceptable clinical and laboratory diagnostic techniques," or (2) "inconsistent with other substantial evidence of record."  20 C.F.R. § 404.1527(c)(2).  If a treating physician's opinion is not given controlling weight, then the ALJ should provide "good reasons" for the weight given and should consider a number of specific factors, such as the length and extent of the treating relationship, the "[s]upportability" of the medical opinion, the "[c]onsistency" with the record, and the doctor's specialization.  *Id.* § 404.1527(c).

The ALJ did not provide "good reasons" for affording "little weight" to Dr. Narracci's June 2018 opinion.  The ALJ gave Dr. Narracci's opinion "little weight" because his "[opinion] is outside his area of expertise."  A.R. at 24.  That assessment is dubious.  The "opinion" requested of Dr. Narracci—regarding Plaintiff's capacity to remain on task—involved general questions pertaining to Plaintiff's capacity to work and function, *see* A.R. at 2351–54; the ALJ offered no explanation why Plaintiff's primary care physician, who had treated Plaintiff for the five months prior, did not have the expertise to make such an assessment (or why specialization was required to do so).  The ALJ also stated in conclusory fashion that Dr. Narracci's opinion is "not supported by the overall evidence of record, which include the claimant's treating mental health providers generally describing her attention and concentration as normal."  A.R. at 24.  But this explanation rests on medical notations of Plaintiff's condition at and during the time of medical visits, *see id.* (citing A.R. at 2377, 2380, 2384), but ignores difficulties with memory and concentration described elsewhere in the records, *see* A.R. at 2361, 2364–65, 2368.  The ALJ's reliance on select portions of the medical records was not a "good reason" to reject the opinion of Plaintiff's treating primary care physician.

The ALJ made similar errors with respect to Dr. Wu's June 2018 opinion.  Most significantly, the ALJ criticized Dr. Wu's opinion as "inconsistent with his own treatment notes, which generally fail to reveal any abnormal findings aside from a depressed, anxious mood and congruent affect."  A.R. at 23.  In support of that explanation, the ALJ cited as an example a single page of medical records, *see id.* (citing A.R. 2358), yet that single page does not capture the full range of Plaintiff's psychological conditions.  For instance, Dr. Wu's most recent treatment notes from May 2017, which the ALJ did not cite, identify Plaintiff as suffering not only from "major depressive disorder," but also "Possible Pain disorder with physical and psychological factors."

A.R. at 2355. Earlier notes confirm the existence of a possible pain disorder with physical and psychological factors, A.R. at 2359, 2362, and reflect Plaintiff's difficulties with memory and concentration, A.R. at 2361, 2364–65, 2368. The ALJ makes no mention of these bases for Dr. Wu's opinion. In addition, the ALJ critiqued Dr. Wu for only treating Plaintiff on an "intermittent basis" and not reviewing the "entire medical record before forming his opinion." A.R. at 23–24. Dr. Wu's treatment frequency of Plaintiff was surely fair game, *see* 20 C.F.R. § 404.1527(c)(2)(i), but discounting his opinion because he had not reviewed Plaintiff's full medical history is questionable. After all, Dr. Wu was a *treating* physician, not a *nontreating* physician, and therefore he was entitled to rely on his own observations, diagnosis, and treatment of Plaintiff in rendering his opinion. *Id.* § 404.1527(c)(2) (giving "more weight to medical opinions from . . . treating sources, since these sources . . . may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations"). Indeed, the SSA regulations observe that the weight given to a *nontreating* physician's opinion will depend on "the degree to which these medical opinions consider all of the pertinent evidence in your claim, including medical opinions of treating and other examining sources." *Id.* § 404.1527(c)(3). No similar consideration is identified with respect to a *treating* physician. *See id.* § 404.1527(c)(2).

None of the foregoing is to say that the ALJ was required to give "controlling weight" to Plaintiff's treating physicians. Such weight is appropriate when the "treating source's medical opinion on the issue(s) of the nature and severity of [a plaintiff's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* The propriety of a controlling weight assessment is better left to the ALJ on remand. The point the court makes here is that the reasons

the ALJ offered for giving "little weight" to the treating physicians' opinions were not "good reasons" supported by substantial evidence.

## V.      CONCLUSION

For the foregoing reasons, the court grants Plaintiff's Motion for Judgment of Reversal, ECF No. 8, and denies Defendant's Motion for Judgment of Affirmance, ECF No. 9.  The court hereby remands the case to the SSA for further proceedings consistent with this Memorandum Opinion.  A separate final order accompanies this Memorandum Opinion.

Dated:  August 18, 2020

Amit P. Mehta
United States District Court Judge